**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0839-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RAUL ZARCO, a/k/a
RAUL RIVERA,
ERICK ZARCO,
ERIC ZARCO, and
POMPO,

     Defendant-Appellant.

_____

Submitted October 22, 2024 – Decided February 19, 2025

Before Judges Susswein, Perez Friscia and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 15-09-1092.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (David M. Liston, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This case arises from a string of grocery/convenience store robberies committed in early 2015 in Perth Amboy. It returns to us after we remanded for a new trial. At the retrial, defendant Raul Zarco was convicted of two counts of second-degree conspiracy to commit robbery and one count of second-degree attempted robbery. Defendant contends the assistant prosecutor improperly exercised peremptory challenges against two black potential jurors. He further contends the trial court committed plain error by allowing a detective to describe codefendant Pedro Ortiz as "very remorseful" and "articulate" when he gave his statement to law enforcement, and to testify about why her attention was drawn to two individuals—defendant and Ortiz—who were concealing their faces and looking towards a convenience store. Defendant also claims his sentence is manifestly excessive.

After carefully reviewing the record in light of the parties' arguments and the governing legal principles, we affirm defendant's trial convictions. With respect to defendant's sentencing contentions, we conclude the trial court properly exercised its discretion in applying the factors relevant to whether to

2

impose consecutive sentences. We are nonetheless constrained to remand because the trial judge imposed an extended term of imprisonment as a persistent offender based on prior convictions found by the judge rather than the jury, contrary to the rule recently announced in <u>Erlinger v. United States</u>, 602 U.S. 821 (2024). We thus remand for proceedings in accordance with <u>Erlinger</u> and <u>State v. Carlton</u>, ___ N.J. Super. ___ (App. Div. 2024).

I.

We discern the following procedural history and pertinent facts from the record. In September 2015, defendant was charged by indictment with nine counts of first-degree robbery, N.J.S.A. 2C:15-1 (counts one, five, nine, thirteen, fourteen, eighteen, twenty, twenty-two, and twenty-eight); eight counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (counts two, six, ten, fifteen, nineteen, twenty-one, twenty-three, and twenty-nine); three counts of fourth-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) (counts three, eleven, and thirty); three counts of third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) (counts seven, sixteen, and twenty-four); six counts of second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 (counts four, eight, twelve, seventeen, twenty-six, and thirty-one); one count of second-degree attempted armed robbery, N.J.S.A. 2C:5-1 (count twenty-five); and one count

of fourth-degree possession of an imitation firearm, N.J.S.A. 2C:39-4(e) (count twenty-seven).

Codefendant Pedro Ortiz was also charged in all counts except eighteen, twenty, twenty-two, and twenty-four. Ortiz pled guilty and testified for the State at both of defendant's trials.[1]

Defendant's first jury trial was held in February and March 2018. After the State rested, the trial judge dismissed counts twenty-two, twenty-three, twenty-eight, twenty-nine, thirty, and thirty-one. The jury found defendant not guilty of counts one, two, three, four, nine, ten, eleven, twelve, eighteen, nineteen, twenty, twenty-one, and twenty-four.

Defendant was found guilty on counts five, six, seven, eight, thirteen, fourteen, fifteen, sixteen, seventeen, twenty-five, twenty-six, and twenty-seven. Thus, defendant was convicted at his initial trial of three counts of first-degree robbery; two-counts of third-degree terroristic threats; two counts of third-degree theft by unlawful taking; three counts of second-degree conspiracy to commit armed robbery; one count of second-degree attempted robbery; and one count of fourth-degree possession of an imitation firearm.

---

[1] In exchange for his cooperation, Ortiz received an aggregate ten-year prison sentence, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for six first-degree robberies.

A-0839-22

On July 10, 2018, the trial judge sentenced defendant to serve an aggregate prison term of forty-seven years, subject to NERA. On July 16, 2020, we reversed defendant's convictions and remanded for a new trial. State v. Zarco, No. A-0186-18 (App. Div. July 16, 2020) (slip op. at 14).

In March 2022, defendant was retried before a different judge. At the retrial, the State presented evidence that on January 31, 2015, around 10:45 p.m., Miguel Moran was preparing to close a mini grocery market in Perth Amboy. As Moran was "walking out of the store, of the main door," two men "dressed in all black, heavy jacket[s], black dark color gloves and face[s] full[y] covered" pushed him back into the store.

Moran testified one of the men "pull[ed] a gun in [his] face and push[ed] me back inside the store. One of them put [Moran] on [his] knee with a gun on [his] head and the other guy just walk[ed] toward the back, went around the corner—the counter went inside and start[ed] loading items, like cigarettes." The men "asked [Moran] for money and any other valuable[s]." Moran gave the men approximately $3,500 that he had in his briefcase.

A surveillance video camera inside the mini grocery market captured the January 31 robbery, which was played for the jury. Ortiz, who testified for the State, identified himself as the robber holding the gun in the video. Ortiz

A-0839-22

identified the other man as defendant. Ortiz testified he got the "[b]lack and silver" gun from defendant. Ultimately, the jury found defendant not guilty on all counts related to the January 31 incident.

The State also presented evidence that on the night of February 9, 2015 Rosa Rosa and Franklin Cruz were working at a grocery store in Perth Amboy when defendant and Ortiz entered. Defendant and Ortiz were dressed in black and covered their faces. Rosa testified the men were "wearing everything black, the head . . . with mask . . . I only see . . . the eyes. Everything was covered." Rosa recalled that the men spoke Spanish with Puerto Rican accents.

Rosa testified defendant pushed her to the front counter and told her to open the cash registers and her purse. Defendant took all the money from both. Cruz testified that Ortiz threw him to the floor at the back of the store. Ortiz put Cruz's hands behind his back and held him down with a black and silver gun. Ortiz testified that he and defendant used this same gun on March 13, 2015. Ortiz ordered Cruz to lie face-down and took approximately $200 from Cruz and Cruz's documents. Ortiz then went to the front of the store, where defendant was struggling with Rosa over a black box containing cash. Ortiz showed Rosa the gun. Rosa let go of the box. Rosa estimated that defendant and Ortiz took approximately $4,000 that night.

6

Surveillance footage from the February 9, 2015 grocery store robbery was played for the jury. Ortiz identified himself and defendant as the robbers in the video.

Perth Amboy Detective Mohamed Mohamed testified that police had no leads as to who committed the robbery until March 13. There was no fingerprint, DNA, or trace evidence from the scene.

Ortiz testified that on the night of March 13, shortly after midnight, he was with defendant outside of the convenience store. He was "just planning on robbing it." When asked whose idea it was to rob the convenience store, Ortiz answered, "I could say both of ours." Ortiz was carrying the silver and black gun. Both men were dressed in all black, wore gloves, and had their faces and heads covered.

After waiting for a customer to leave, defendant and Ortiz walked toward the entrance of the convenience store. As they reached the store's parking lot, "[a] police officer pulled up" in a marked police car. Ortiz testified he "pulled what was covering my face down and proceeded inside the store." Defendant started walking in the opposite direction towards a nearby Dunkin' Donuts.

Perth Amboy Police Lieutenant (then-Sergeant) William Dillon, who was driving the marked police car, got out of the car. When Ortiz left the

7

convenience store "maybe a minute later," Dillion "called [Ortiz] over to [him] to talk." Dillion was responding to "a call of two suspicious individuals on Herbert Street, towards the rear of [the convenience] store wearing masks." The call was based on Perth Amboy Sergeant (then-Detective) Jessica DeJesus' observation of the two individuals and the fact that there had "recently" been "several robberies with the same description in town."

As Ortiz was attempting to retrieve his identification from his person, Dillon "saw the gun in his waistband." Dillion then grabbed Ortiz, and after a struggle, recovered the Taurus Airsoft gun Ortiz was carrying and placed him under arrest.

As Dillon was questioning Ortiz, DeJesus and Officer Daniel Mendes arrived at the scene and detained defendant. Defendant was "walking away from the convenience store [and] dressed in all black." He "had a black wool cap, black long jacket . . . black pants and black shoes." Mendes testified that defendant "was a bit evasive" but complied with police commands.

Defendant and Ortiz were transported to police headquarters. Ortiz gave a statement to police implicating himself and defendant in the January 31 and February 9, 2015 grocery/convenience store robberies.

Based on the foregoing evidence, the jury acquitted defendant on counts five, six, seven, eight, thirteen, fourteen, fifteen, sixteen, and twenty-seven. Defendant was found guilty on counts seventeen, twenty-five, and twenty-six. All told, defendant was found guilty of two counts of second-degree conspiracy to commit robbery and one count of second-degree attempted robbery.

On November 10, 2022, after merging counts twenty-five and twenty-six, the judge granted the State's motion for an extended term of imprisonment as a persistent offender. The judge sentenced defendant to fifteen years imprisonment subject to NERA on count seventeen and seven years imprisonment on count twenty-six. The judge ordered the sentences to be served consecutively.

This appeal followed. Defendant raises the following contentions on appeal:

POINT I

THE IMPROPER RACE-BASED EXERCISE OF PEREMPTORY CHALLENGES BY THE STATE AGAINST EITHER OR BOTH OF TWO BLACK JURORS WARRANTS A REVERSAL OF THE DEFENDANT'S CONVICTIONS.

POINT II

IT WAS PLAIN ERROR FOR A DETECTIVE TO OFFER THE JURY AN OPINION THAT THE

A-0839-22

STATE'S MAIN WITNESS—THE CODEFENDANT WHO WAS INCULPATING THE DEFENDANT PURSUANT TO AN EXTREMELY GENEROUS PLEA DEAL—WAS "VERY REMORSEFUL" AND "ARTICULATE" WHEN GIVING A STATEMENT TO LAW ENFORCEMENT ABOUT THE CASE. THE STATE MAY NOT OFFER OPINION EVIDENCE REGARDING THE CREDIBILITY OF A WITNESS' PARTICULAR STATEMENT. (NOT RAISED [AT THE TRIAL COURT]).

POINT III

A DETECTIVE IMPROPERLY OFFERED HER LAY OPINION ABOUT THE DEFENDANT'S CONDUCT AND IMPROPERLY IMPLIED THAT THERE WAS ADDITIONAL EVIDENCE ABOUT ROBBERIES THAT THE JURY DID NOT HEAR, WHEN SHE TOLD THE JURY THAT: (1) IT WAS HER OPINION THAT WHAT SHE SAW IN FRONT OF THE [CONVENIENCE STORE] WAS PREPARATION FOR A ROBBERY SIMILAR TO OTHERS IN TOWN, AND (2) THAT WHAT SHE SAW WAS "SIGNIFICANT" BECAUSE RECENTLY ["]WE HAVE HAD SEVERAL ROBBERIES IN TOWN WITH THAT DESCRIPTION." (NOT RAISED [AT THE TRIAL COURT]).

POINT IV

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

## II.

We first address defendant's contention regarding the prosecutor's use of preemptory challenges. The prosecutor exercised his fourth peremptory challenge to excuse a black woman. Defense counsel asked for a sidebar expressing her concern that "[t]here are very few African-Americans in the pool." In response, the judge stated: "[y]ou struck an African-American. Now [the State] just struck an African-American, their first one." The judge continued, "[y]our client's not even African-American; right? . . . So, explain to me what you believe is their reason." The judge reiterated, "I want you [defense counsel] to tell me why you want me to inquire as to why [the State] just struck one African-American. There's no pattern here." Defense counsel replied, "it doesn't have to be a pattern . . . [defendant] has a right to . . . he doesn't have to be the same race in order to have the right of (indiscernible)."

The judge ultimately overruled defense counsel's objection, reasoning that "this is [the State's] first challenge . . . I don't see any pattern here. . . . [T]hey struck one [j]uror as you did." The judge thereupon excused the black female juror.

After she was excused, defense counsel excused five potential jurors and the State excused one, a black male juror. Defendant contests the State's

11

peremptory challenge of that juror, arguing that the State's justification for striking him "was full of holes, and the judge immediately seemed to point that fact out to the State, albeit indirectly." Defendant argues on appeal "the State's preposterous alleged reasons for excluding [him] should have been rejected and [he] should have been left on the panel."

After the male juror was excused and left the courtroom, defense counsel asked for a sidebar stating, "I think now we're starting to look like a pattern." The judge responded, "why didn't you say anything before . . . the [j]uror left? You waited till the [j]uror left, walked out . . . of the courtroom, and now . . . you're raising an objection." Defense counsel replied, "Judge, I'm going to apologize, but this is a bizarre and strange thing to me." Defense counsel then stated, "it's a pattern . . . . Well, it's two in a row." She asked to know the State's basis for excusing the black male juror.

The judge inquired into the prosecutor's basis and the following colloquy ensued:

> [The prosecutor]: Yesterday, the [j]uror had mentioned that he worked at Northern State Prison and so—
>
> The [c]ourt: All right. So, you want to give an explanation. Okay. That's fine.
>
> [The prosecutor]: Yeah . . . we were just concerned about his work in a prison system as a . . . psychologist

and so, he's worked with inmates before, and that . . . was the basis for the objection.

The [c]ourt: The basis.  So, you say the basis of the objection . . . was his background as a psychologist.  I think yesterday he told . . . he counseled inmates, he worked with inmates.

[The prosecutor]: Right.

The [c]ourt: And . . . how was it that you . . .

[The prosecutor]: I just don't know if that would garner sympathy for inmates or for people that are incarcerated . . .

The [c]ourt: Well . . . he's not going to hear that your client's in—or that the defendant's incarcerated.

[The prosecutor]: I know, but he . . . worked with people . . . in the prison system before and . . . he knows that this man is charged with armed robbery.  He might know sentencing laws and that kind of thing, so the State was just concerned about that.

The [c]ourt: Isn't there an inmate testifying in this case?

[The prosecutor]: There—there is, Judge.

The [c]ourt: Okay.  Where is he . . . located?  Is he in Northen State or—

[The prosecutor]: . . . I believe he's in Bayside, but I don't know where he's been incarcerated previously.

The [c]ourt: . . . [S]o, the reason you wanted to excuse him is based on the fact that . . . he served as a—I guess worked in . . . the psych . . . as a sort of professional . . .

A-0839-22

in his graduate program working directly with State Prison inmates?

[The prosecutor]: That's correct, Judge.

Defense counsel responded, "I think yesterday, you know, you gave each side ample opportunity to ask additional questions and . . . here, we're hearing speculation . . . from the State." Ultimately, the judge overruled the defense objection, explaining:

> Well, I think they . . . have to give a reason. Now, the question is . . . is it a contrived reason or is it a (indiscernible) reason. I think, I think you should get the . . . [p]rosecutor has given a reason. I think you know, that there's some merit to that . . . position. Whether I agree with it or not, I mean . . . it's not a whilly-nilly explanation. I don't necessarily believe it's contrived or it's based on race at this point . . . . So, I'm going to overrule the objection at least with respect to this . . . [j]uror . . . the next [j]uror we just seated, I think . . . she's African-American, too; right?[2]

## A.

We begin our analysis by acknowledging the governing legal principles. The State's ability to exercise peremptory challenges is not absolute. The United States and New Jersey Constitutions prohibit discrimination based on race in the jury selection process. Batson v. Kentucky, 476 U.S. 79, 96 (1986); State v.

---

[2] The defense excused the next potential juror, a black woman.

Andujar, 247 N.J. 275, 297 (2021); State v. Gilmore, 103 N.J. 508, 524-27 (1986). In Batson, the United States Supreme Court established a three-part test to determine whether an alleged discriminatory peremptory challenge violates the Equal Protection Clause. 476 U.S. at 93-94, 96-98. Our Supreme Court outlined a similar three-step analysis for trial courts to follow when adjudicating a claim of unconstitutional discrimination in the use of peremptory challenges in Gilmore, 103 N.J. at 533-39, and "slightly" refined the methodology in State v. Osorio, 199 N.J. 486, 492 (2009).[3]

"That analysis begins with the 'rebuttable presumption that the prosecution has exercised its peremptory challenges on' constitutionally

---

[3] Prompted by Andujar, 247 N.J. at 275, in its July 2022 order, our Court adopted Rule 1:8-3A and revised Rule 1:8-3(b) to read, "if the court finds there is a reasonable basis to doubt that the juror would be fair and impartial, the court shall grant the for-cause challenge." See State v. Silvers, 477 N.J. Super. 228, 243-44 (App. Div. 2023), cert. denied, 256 N.J. 197 (2024) (emphasis in original). With these changes, there is no requirement for a finding of purposeful discrimination or bias. The new provision places a burden on the party using such a peremptory challenge to show that the reason for the strike is related to the demands of being a juror in that particular case. Pressler & Verniero, Current N.J. Court Rules, off. cmt. on R. 1:8-3A (2024). Criminal cases that participated in the pilot program on attorney-conducted voir dire were subject to the new rule starting September 2022. The program became effective for all criminal and civil jury trials on January 1, 2023. Here, jury selection at defendant's second trial occurred on March 16, 17, and 18, 2022. This predates the changes and launch of the pilot program. Thus, we analyze it under the standards and case law applicable at the time of the challenges.

A-0839-22

permissible grounds." State v. Thompson, 224 N.J. 324, 340 (2016) (quoting Gilmore, 103 N.J. at 535). Defendant must first make a "prima facie showing that the prosecution exercised its peremptory challenges on constitutionally[] impermissible grounds." Gilmore, 103 N.J. at 535. "That burden is slight, as the challenger need only tender sufficient proofs to raise an inference of discrimination." Osorio, 199 N.J. at 492.

If the court determines a prima facie case has been made, "[t]he burden shifts to the prosecution to come forward with evidence that the peremptory challenges under review are justifiable on the basis of concerns about situation-specific bias." Gilmore, 103 N.J. at 537. To satisfy this burden, "the State must articulate 'clear and reasonably specific' explanations of its 'legitimate reasons' for exercising each of the peremptory challenges." Ibid. (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 258 (1981)). Further, the reasons provided by the State must be reasonably relevant to the case or the parties and witnesses. State v. Clark, 316 N.J. Super. 462, 469 (App. Div. 1998). The court "must make specific findings with respect to the prosecution's proffered reasons for exercising any disputed challenges." Id. at 473.

If the party exercising the peremptory strike satisfies its burden under the second prong of the analysis, then the trial court must weigh the prima facie case

against the exercising party's rebuttal "to determine whether the [opposing party] has carried the ultimate burden of proving, by a preponderance of the evidence, that the [striking party] exercised its peremptory challenges on constitutionally[] impermissible grounds of presumed group bias." Gilmore, 103 N.J. at 539; Osorio, 199 N.J. at 492-93, 506. Courts should look to "whether the [exercising party] has applied the proffered reasons . . . even-handedly to all prospective jurors;" "the overall pattern of the [exercising party]'s use of its peremptory challenges," examining whether a disproportionate number of peremptory challenges were used on a cognizable group; and "the composition of the jury ultimately selected to try the case." Osorio, 199 N.J. at 506 (quoting Clark, 316 N.J. Super. at 473-74). "This analysis presumes that a defendant will present information beyond the racial makeup of the excused jurors." Thompson, 224 N.J. at 348.

We review a trial court's decision regarding the State's use of its peremptory challenges for abuse of discretion and accord substantial deference to a court's findings regarding peremptory challenges. State v. Pruitt, 438 N.J. Super. 337, 343 (App. Div. 2014). "[W]e also owe some deference to [the court's] ability to gauge the credibility of the explanation." Ibid. Therefore, we will uphold the trial court's ruling on whether peremptory challenges were made

on a constitutionally impermissible basis unless it is clearly erroneous. Thompson, 224 N.J. at 344.

B.

We next apply the foregoing principles to the present facts. With respect to the female black juror, we agree with defendant that he "need not be a member of the excluded group in order to allege a violation of the representative cross-section rule." Gilmore, 103 N.J. at 535-36 n.9. However, we also agree with the trial judge that defendant did not make a prima facie showing the State challenged the female black juror on constitutionally impermissible grounds. Id. at 535. Defendant did not "present information beyond the racial makeup of the excused juror[]." Thompson, 224 N.J. at 348. As the trial judge noted, there was no pattern of the State excusing black jurors as this was the first black juror the State excused. See Osorio, 199 N.J. at 506; State v. Bey, 129 N.J. 557, 585 (1992) (finding that no prima facie showing when the State exercised one peremptory challenge against one potential black juror and another four against potential jurors who were not black); State v. Huff, 292 N.J. Super. 185, 192-93 (App. Div. 1996) (finding that no prima facie showing when the State exercised one peremptory challenge to excuse the only remaining black juror after excusing seven white jurors). Because defendant did not make a prima facie

18

showing, the judge did not err in ending its analysis without requiring the State to "articulate 'clear and reasonably specific' explanations of its 'legitimate reasons'" for excusing the black female juror. Gilmore, 103 N.J. at 537.

We turn our attention to defendant's claim regarding the State's challenge to the male black juror. This time, the judge determined defendant made a prima facie showing that the State exercised its peremptory challenge on constitutionally impermissible grounds. See Gilmore, 103 N.J. at 535. Accordingly, the judge asked the State to justify its peremptory challenge by "articulat[ing] 'clear and reasonably specific' explanations of its 'legitimate reasons.'" Id. at 537; see also Osorio, 199 N.J. at 492.

The judge accepted the State's race-neutral justification—that the State was concerned about the juror's experience with the State Prison system and potential knowledge about sentencing which might garner sympathy for defendant. See Osorio, 199 N.J. at 506; Clark, 316 N.J. Super. at 469. The judge's finding is entitled to "substantial deference." Thompson, 224 N.J. at 344; see also Pruitt, 438 N.J. Super. at 343.

We reject defendant's characterization that the prosecutor's reasons for excusing the juror are "preposterous." On the contrary, like the trial judge, we view the State's concern regarding the potential juror's possible knowledge of

19

defendant's sentencing exposure as a legitimate consideration in exercising a peremptory challenge.  In State v. Mahoney, we acknowledged:

> It is well settled that "jurors decide the facts in accordance with the law as instructed by the court, and the court determines the punishment to be imposed upon the jury finding of guilt." State v. Reed, 211 N.J. Super. 177, 184 (App. Div. 1986).  Jurors are therefore not informed as to the possible sentence of a defendant. Ibid.  This rule "is based upon the rationale that informing the jury of the possible sentence would:  (1) draw attention away from their chief function—to judge facts; (2) open the door to compromise verdicts; and (3) confuse the issue or issues to be decided." Id. at 185.  The premise of this rule is based on the unique function and role of the jury.
>
> [444 N.J. Super. 253, 259 (App. Div. 2016).]

In these circumstances, and according due deference to the trial judge's exercise of discretion, we are unpersuaded that defendant is entitled to a new trial based on the impermissible exercise of peremptory challenges.

## III.

We next address defendant's contention, raised for the first time on appeal, that the trial judge committed plain error by allowing Detective DeJesus to comment that Ortiz was "very remorseful" and "articulate" when he gave his statement to police.  During DeJesus' direct examination, the following colloquy ensued:

[The prosecutor]: Did you take a statement from Mr. Ortiz?

DeJesus: Yes.

[The prosecutor]: Was there anything recovered on Mr. Ortiz?

DeJesus: A[n] Airsoft pistol.

[The prosecutor]: Did you ever have the opportunity to review that Airsoft pistol?

DeJesus: I viewed it, yes.

[The prosecutor]: Now, during the statement that you took of Mr. Ortiz, how did he appear to you?

DeJesus: He was very—it was very good dialogue. He appeared very remorseful. He appeared articulate and it was very good conversation.

The gravamen of defendant's argument on appeal is that DeJesus offered a lay opinion regarding the credibility of Ortiz's statement to police that incriminated defendant. Defendant contends her testimony violates the general principle that "credibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance." State v. Frisby, 174 N.J. 583, 595 (2002). We are unpersuaded that the detective's comment rises to the level of plain error.

A-0839-22

Under N.J.R.E. 701, lay witnesses may give relevant opinion testimony only if that opinion "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." State v. McLean, 205 N.J. 438, 456 (2011) (quoting N.J.R.E. 701). To satisfy the first condition, the "witness must have actual knowledge, acquired through [their] senses, of the matter to which [they testify to]." State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)). The second condition limits lay testimony to that which will "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 469 (quoting State v. Singh, 245 N.J. 1, 15 (2011)).

Stated another way, a police officer may "offer lay opinions in certain circumstances when 'the lay opinion testimony was based on, and supported by testimony about, the officer's personal perception and observation.'" State v. Derry, 250 N.J. 611, 632 (2022) (quoting McLean, 205 N.J. at 459). Here, DeJesus described Ortiz as "very remorseful" and "articulate" based on her personal perception and observations of Ortiz during their interactions at police headquarters. See id. at 632.

A-0839-22

We are not convinced, however, that DeJesus' characterization of Ortiz's demeanor meets the second condition of lay opinion testimony. Contrary to defendant's interpretation, we are not persuaded DeJesus commented impermissibly on Ortiz's credibility or veracity. Rather, she commented on Ortiz's emotional state, appearance, and ability to communicate during his statement to police. Cf. State v. Bealor, 187 N.J. 574, 588-89 (2006) (allowing a police officer to testify about observations of the defendant's behavior indicative of narcotics intoxication).

But even accepting the witness's remark was objectionable, the fact remains there was no objection. In State v. Nelson, our Supreme Court stressed that the failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial. 173 N.J. 417, 471 (2002). See also State v. Frost, 158 N.J. 76, 84 (1999) (holding that "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made.")

We add that after DeJesus' answer, the prosecutor asked no follow up questions. Additionally, the prosecutor did not mention Ortiz's apparent remorsefulness in summation. These circumstances suggest that the testimony defendant now challenges was isolated, fleeting, and unlikely to have caused

23

defendant prejudice.  See State v. Clark, 251 N.J. 266, 287 (2022).  We thus conclude the detective's comments were not "clearly capable of producing an unjust result."  R. 2:10-2.

IV.

Defendant also argues, again for the first time on appeal, DeJesus "improperly offered her lay opinion about the defendant's conduct and improperly implied that there was additional evidence about the robberies that the jury did not hear, when she told the jury" that (1) "it was her opinion that what she saw in front of the [convenience store] was preparation for a robbery similar to others in town" and (2) "what she saw was 'significant' because 'recently [they] have had several robberies in town with that description.'"

Specifically, defendant focuses on following underscored portions of DeJesus' testimony:

> [The prosecutor]: What happened on your way home [from your parent's house on March 13, 2015]?
>
> DeJesus: So, on my way home I took that route and as I was approaching the area of Herbert and Smith Street I was drawn to two individuals who were behind the white [convenience store] fence.  It was—that area is well lit, it's very illuminated with a lot of light because of that pole.  The white also kind of makes the area a lot brighter.  Those two individuals on a ledge on the Herbert Street building and they were putting on or covering and concealing their faces and covering

> themselves and animatedly talking and looking towards the [convenience store].
>
> [The prosecutor]: Were there a lot of other individuals around?
>
> DeJesus: No there was no one.
>
> [The prosecutor]: . . . [W]hat was significant about that to you?
>
> DeJesus: It was significant because recently we have had several robberies with the same description in town.
>
> [The prosecutor]: Okay, so when you saw this what did you do?
>
> DeJesus: At that point . . . I was actually on the phone with one of my coworkers. And at that point I gave them all the information, I relayed it to him . . . .
>
> [(emphasis added).]

We reiterate that "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard." Singh, 245 N.J. at 13. Further, police officers may "offer lay opinions in certain circumstances when 'the lay opinion testimony was based on, and supported by testimony about, the officer's personal perception and observation.'" Derry, 250 N.J. at 632 (quoting McLean, 205 N.J. at 459). However, "a question that requires a witness to use '[their] training and experience' to 'testify about [their] belief as

A-0839-22

to what had happened,' strongly suggests that the question calls for an expert opinion." Ibid. (quoting McLean, 205 N.J. at 462).

Defendant relies on McLean, State v. Reeds, 197 N.J. 280, 284-85 (2009), and Frisby, 174 N.J. at 594, to support his argument that DeJesus "should not have been offering an opinion to the jury that functionally told jurors that she believed she was watching the preparations for a robbery." Defendant acknowledges DeJesus was allowed to tell jurors what she saw—people covering their faces and gesturing towards the store. However, defendant argues DeJesus "was not allowed to tell jurors her lay opinion of what she thought that 'meant,' or in the words of the prosecutor, why her observation was 'significant.'"

In McLean, our Supreme Court considered "whether a police officer, who observed defendant Kelvin McLean engage in behavior that the officer believed was a narcotics transaction, should have been permitted to testify about that belief pursuant to the lay opinion rule." McLean, 205 N.J. at 443. Ultimately, the Court concluded the officer's opinion did not qualify as a lay opinion and "invaded the fact-finding province of the jury." Ibid.; see also Derry, 250 N.J. at 617 (finding that an FBI agent's testimony about his interpretations of slang terms in a conversation the agent did not participate in should have been admitted as expert opinion testimony—not lay opinion).

In <u>Reeds</u>, the Court found the State's drug possession and distribution methods expert provided improper testimony by opining that the defendant was in "constructive possession" of the drugs police recovered from the car which the defendant was driving. 197 N.J. at 284-85. The Court explained, "[t]he expert may not usurp the province of the jury to decide the ultimate issue of defendant's guilt . . . [t]he question of constructive possession of the drugs found in the car was one that the jury was capable of and required to assess itself, by drawing on inferences and applying common logic and knowledge." <u>Id.</u> at 285.

Similarly, in <u>Frisby</u>, the Court found that a State investigator's testimony suggesting that one witness was "more credible" than the other was improper. 174 N.J. at 594-95. The Court reversed the defendant's convictions and remanded for a retrial explaining, "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful." <u>Id.</u> at 596.

We are satisfied that the present circumstances are different from those in the cases defendant now relies upon. Unlike testimony regarding the modus operandi of drug traffickers, donning clothing to conceal one's identity is not conduct that requires expert opinion. Rather, putting on a mask to hide one's face is an action that jurors can understand without the benefit of an expert opinion.

27

Furthermore, DeJesus' comments explained her own actions on March 13, 2015. After DeJesus testified she "was drawn to" the two individuals concealing their faces, the prosecutor asked why that was "significant" to her. In practical effect, the prosecutor was asking DeJesus to explain why her attention "was drawn to" the two individuals. DeJesus explained that there had recently been "several robberies with the same description" in town, which led her to relay the information to police. We are not convinced this isolated testimony was admitted in error. Even assuming for the sake of argument the form of the prosecutor's question was improper, DeJesus' explanation does not rise to the level of plain error. We reiterate and stress that defense counsel's failure to object signals she did not believe the witness's remark was prejudicial at the time it was made. Frost, 158 N.J. at 84.

Nor are we persuaded by defendant's contention that plain-error reversal is required "because of the confrontation and hearsay implications" of DeJesus' testimony. Defendant claims, for the first time on appeal, "there is no legitimate reason for the State to ask a question in front of the jury about why police decided to pursue a particular line of investigation if that question is necessarily based upon hearsay, and implied that there is evidence that the police know about, but which is not presented to the jury." See State v. Branch, 182 N.J.

A-0839-22

338, 351 (2005) ("[A] police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant."). Further, defendant argues, this testimony:

> not only improperly put DeJesus' lay opinion in front of the jury regarding the incriminating nature of defendant's conduct, but it implied the existence of secret evidence, unable to be confronted, unavailable to the jury, and related to at least three other robberies ("several") that made DeJesus think defendant was about to commit a robbery.

See State v. Lazo, 209 N.J. 9, 12-13 (2012) (finding that a police officer's testimony explaining why he picked the defendant's photograph for array shown to the victim inadmissible and not harmless error).

Here, however, the jury already heard testimony—from police and civilian witnesses—about two convenience store robberies in Perth Amboy involving individuals wearing masks in the weeks leading up to the March 13, 2015 incident. See Branch, 182 N.J. at 352. For example, before DeJesus testified, Detective Liza Capo testified about a January 31, 2015 convenience store robbery in Perth Amboy. The jury heard testimony from Moran, a victim of the January 31 robbery, about the two robbers "dressed in all black, heavy jacket[s],

A-0839-22

black dark color gloves and face[s] full[y] covered."[4]  Mohamed testified about a February 9 bodega robbery involving two males "dressed in black, faces covered."

In sum, nothing in DeJesus' testimony suggested to the jury she was aware of "secret evidence," to borrow defendant's characterization.  Therefore, even if we were to assume DeJesus' comment explaining why she called police on March 13, 2015 was improper, it was not "clearly capable of producing an unjust result," given that the jury already heard about the other convenience store robberies in Perth Amboy.  R. 2:10-2.

To the extent we have not specifically addressed them, any remaining arguments defendant raises with respect to his trial convictions lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

## V.

Finally, we address defendant's sentence.  As noted above, the trial court imposed a fifteen-year extended prison term, subject to the NERA's eighty-five percent parole disqualifier, for attempted robbery for the February 9, 2015 incident and a consecutive term of seven years imprisonment for conspiracy to

---

[4]  Moran "passed away of natural causes and [was] unable to be present for this court proceeding."  The jury had played his "previously sworn testimony."

commit robbery for the March 13 incident.  Defendant argues the trial judge erred by treating "the February 9 matter as if the jury had returned a guilty verdict for an actual first-degree robbery, rather than what the jury actually did: acquitting of that robbery and returning a verdict only for second-degree conspiracy to commit a robbery."  Defendant also argues the judge failed "to give any statement of reasons under State v. Cuff, 239 N.J. 321, 347-52 (2019), and State v. Torres, 246 N.J. 246, 270 (2021), justifying the aggregate [twenty-two]-year sentence."

Defendant's contention that the trial judge misinterpreted the jury verdict and sentenced defendant as if he had been convicted of a count for which he was acquitted is belied by the record and does not warrant extensive discussion.  See R. 2:11-3(e)(2).  The record confirms the judge sentenced defendant for conspiracy to commit robbery, not robbery.

We likewise reject defendant's contention the trial judge failed to explain the basis for the aggregate sentence that was imposed.  Sentencing determinations are reviewed on appeal with a highly deferential standard.  State v. Fuentes, 217 N.J. 57, 70 (2014).  The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent

31

and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). Once a sentencing court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within the permissible range for the offense." State v. Morente-Dubon, 474 N.J. Super. 197, 208 (App. Div. 2022) (quoting State v. Bieniek, 200 N.J. 601, 608 (2010)); see also State v. Case, 220 N.J. 49, 65 (2014) (instructing that appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record").

When sentencing a defendant for multiple offenses, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a). In State v. Yarbough, 100 N.J. 627, 642-44 (1985), our Supreme Court established criteria that a sentencing court must consider when deciding whether to impose consecutive sentences. "The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348. A "sentencing court must explain its decision to impose concurrent

or consecutive sentences in a given case."  Ibid.  "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal."  State v. Miller, 205 N.J. 109, 129 (2011).  An explanation of the "overall fairness" is necessary "to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'"  Torres, 246 N.J. at 272 (alteration in original) (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)).

Here, the trial judge explained why he imposed consecutive sentences, stating:

> Now the reason I'm imposing a consecutive sentence is because [Yarbough] provides in these circumstances that essentially . . . there can be no free crimes in a system for which the punishment shall fit the crimes.
>
> Here we have two separate incidences, two separate crimes . . . . [A]lthough the defendant engaged in the same behavior, their objectives were predominantly independent of each other.  They involved—or well the fact that the nature of the offense was a robbery, they would have involved—at least one of them, the defendant was actually in the course of and the other one he was preventing from engaging in.  But they're . . . both essentially separate violent offenses . . . . They were committed at different times, in different places.  This was not a single period of abhorrent behavior.  They . . . would have involved multiple victims; one in fact did—had victims in one

A-0839-22

> location and then in the other location there would have been victims had DeJesus not intervened. So for that reason I'm imposing a consecutive sentence.
>
> [(emphasis added).]

Although we are satisfied the judge explained the basis for his decision to impose consecutive sentences applying the Yarbough criteria, the judge did not make an express statement with regard to the overall fairness of the aggregate sentence as required in Torres, 246 N.J. at 268. As our Supreme Court emphasized, "the overall fairness of a sentence to be imposed serves to validate a court's decision by contextualizing the individual sentences' length, deterrent value, and incapacitation purpose." Id. at 271. We therefore deem a remand appropriate to assure compliance with Torres.

As we have noted, a trial court "may impose a term within the permissible range for the offense." Morente-Dubon, 474 N.J. Super. at 208. In this instance, defendant was sentenced to a discretionary extended term of imprisonment as a persistent offender. N.J.S.A. 2C:44-3(a). Recently, the United States Supreme Court in Erlinger held "the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his exposure to punishment." 602 U.S. at 828. The Court further stated, "[v]irtually 'any fact' that 'increase[s] the prescribed range of

34

penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Id. at 834 (alteration in original) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

We recently concluded in Carlton that pursuant to Erlinger, "a unanimous jury must find beyond a reasonable doubt that all . . . of the [N.J.S.A. 2C:44-3(a)] factual predicates are present, or the defendant must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility." ___ N.J. Super. at ___ (slip op. at 22-23). We further concluded in Carlton that the application of Erlinger's holding to the persistent offender statute, N.J.S.A. 2C:44-3, applies retroactively to pipeline cases. Id. at ___ (slip op. at 20); see also Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (holding that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past").

We therefore afforded Erlinger's holding pipeline retroactivity to Carlton's direct appeal of his sentence. We reversed Carlton's extended term sentence and remanded for resentencing consistent with Erlinger. Id. at ___ (slip op. at 66).

We added that if the State seeks to impose an extended term sentence on remand, the trial court must hold a jury trial limited to the question of whether defendant is a persistent offender. Ibid. See N.J.S.A. 2C:44-3(a). The State shall have the burden of proving, beyond a reasonable doubt, the required persistent offender elements. Carlton, ___ N.J. Super. at ___ (slip op. at 65).

Because we deem it appropriate to remand for the trial judge to provide "[a]n explicit statement, explaining the overall fairness" of defendant's aggregate sentence pursuant to Torres, 246 N.J. at 268, we also instruct the judge on remand to address the Erlinger violation in accordance with Carlton. Compliance with Erlinger is needed to ensure the legality of the extended term of imprisonment that the judge imposed.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0839-22